# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs September 7, 2016

## STATE OF TENNESSEE v. DOYAN ANDERSON

**Appeal from the Criminal Court for Shelby County**
**No. 15-03854     W. Mark Ward, Judge**

—————————————

**No. W2015-02405-CCA-R3-CD  -  Filed May 24, 2017**

—————————————

The Defendant, Doyan Anderson, was indicted for aggravated assault involving the use or display of a deadly weapon, a Class C felony; aggravated assault based on violation of a court order, a Class C felony; domestic assault, a Class A misdemeanor; and unlawful possession of a firearm after having been convicted of a felony involving the use or attempted use of violence, a Class C felony.  See Tenn. Code Ann. §§ 39-13-102(a)(1)(A)(iii), -13-102(c), -13-111, -17-1307.  Following a jury trial, the Defendant was convicted of domestic assault and both counts of aggravated assault.  The jury acquitted the Defendant of the unlawful possession of a firearm charge.  The trial court merged the domestic assault conviction into the aggravated assault conviction based on violation of a court order.  The trial court sentenced the Defendant as a career offender and imposed a total effective sentence of thirty years' incarceration.  In this appeal as of right, the Defendant contends (1) that the evidence was insufficient to sustain his conviction for aggravated assault involving the use or display of a deadly weapon and (2) that the trial court committed plain error by failing to require the State to make an election of the distinct conduct it was relying upon regarding the charge of aggravated assault based on violation of a court order.  After the initial filing of this opinion, we granted the State's Tennessee Rule of Appellate Procedure 39 petition to rehear to allow for supplemental briefing on the issue of whether the Defendant's aggravated assault convictions should be merged.  Following our review, we affirm the Defendant's convictions.  However, we merge the Defendant's two convictions for aggravated assault and remand the case to the trial court for entry of corrected judgment forms reflecting said merger and the resulting sentence of fifteen years' incarceration.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Case Remanded for Entry of Corrected Judgments**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Stephen C. Bush, District Public Defender; Tony N. Brayton (on appeal) and Robert C. Felkner (at trial), Assistant District Public Defenders, for the appellant, Doyan Anderson.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; Jamie Bowers Kidd and Danielle Marie McCollum, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

The victim, Melanie Tenort, testified that she had been in a relationship with the Defendant for "five and a half years on and off" and that he was the father of her youngest son.[1] To give context to her relationship with the Defendant, Ms. Tenort testified about an event that occurred around Thanksgiving 2013. Ms. Tenort testified that she was staying at a hotel with the Defendant and their son, who was two years old at the time. Ms. Tenort recalled that she and the Defendant were "talking about . . . getting back together" because the Defendant had "just [come] back" to Memphis. Eventually, the father of her oldest son dropped him off at the hotel.

Ms. Tenort testified that she was "sitting there watching movies" with the Defendant and her children when the Defendant received a phone call from his father. After fifteen or twenty minutes, the Defendant hung up the phone and was noticeably angry. The Defendant turned off the lights and the television and said that he was "trying to go to [f--king] sleep." Ms. Tenort thought that the Defendant's voice "sound[ed] like [he was] fixing to get hostile" and "start something." Ms. Tenort began to gather her things so she and the children could leave the hotel room.

Ms. Tenort asked her oldest son to turn the lights back on so she could see to pack. As she was packing, the Defendant approached her and said, "[Y]ou not fixing to go nowhere [sic]." Ms. Tenort implored the Defendant not to "put [his] hands on [her] in front of the kids." The Defendant responded by punching her in the face "three or four times." The Defendant then pushed her to the ground and began choking her "[r]eal hard" to the point that she could not breathe. Ms. Tenort tried to kick the Defendant off of her and told the Defendant that the children were watching him.

At that point, both of the children tried to stop the Defendant by "hitting him on his back." The Defendant struck both of the children, knocking the youngest one down. When he did this, the Defendant "kind of eased up off of" Ms. Tenort, and she was able

---

[1] The Defendant and Ms. Tenort's son died prior to the trial in this matter.

to kick him off of her. Ms. Tenort took the children and left the room. Ms. Tenort called the police from a nearby gas station. The Defendant was arrested a short time later at the hotel room.

Ms. Tenort opined that the Defendant did not leave the hotel room because he did not think that she would call the police. Ms. Tenort explained that she had "never called the police on him before" because she was scared of "what [the Defendant] could do to [her] after the fact." Ms. Tenort continued, testifying that she decided to call the police because the Defendant "kept doing it" and "it [had] gotten even worse and in front of [her] kids." Ms. Tenort was especially troubled by the fact that the Defendant had hit her children during the attack.

Officer Farrell Brassell of the Memphis Police Department (MPD) testified that on December 2, 2013, he responded to a call from Ms. Tenort. Officer Brassell recalled that Ms. Tenort was "hysterical" and "kind of emotional" when he spoke to her. Officer Brassell observed that Ms. Tenort had red marks on her neck, a "busted" lip, and knots on her forehead. In contrast, the Defendant was calm and had no injuries when Officer Brassell arrested him.

Ms. Tenort testified that she did not return to the hotel room and that the next day she filed for an order of protection against the Defendant. The order was entered on December 19, 2013, and Ms. Tenort testified that she watched the Defendant sign the order. The order enjoined the Defendant from abusing Ms. Tenort or her children and ordered that the Defendant "stay away from [her] and . . . the children." However, in late December 2013 and early January 2014, the Defendant began to contact Ms. Tenort saying that "he was sorry" and that "he wanted . . . to get back together."

The Defendant told Ms. Tenort that "he loved [her] and that he [would] never hit [her] again . . . [and that] he wanted to marry [her]." Ms. Tenort testified that she "felt like [the Defendant] really meant it" and that she believed him. Ms. Tenort began "telling everybody [that they were] engaged." Ms. Tenort explained that she loved the Defendant and that she "was excited" about marrying him because she "thought that he was going to change." To that end, the Defendant moved in with Ms. Tenort in February 2014. Ms. Tenort further explained that she was not working at that time and needed the Defendant to help financially with the children.

Ms. Tenort testified that she thought her relationship with the Defendant was "[g]reat" until March 21, 2014. After she woke up that morning, the Defendant approached Ms. Tenort, "not in a hostile way," in the dining room wanting to talk about a verbal argument they had the night before. The Defendant stated that Ms. Tenort had "cursed [him] out" the night before and that Ms. Tenort's oldest son, who was nine years old at the time, agreed with the Defendant. Ms. Tenort testified that she was about to

apologize to the Defendant when he "started punching [her] in [her] face and in [her] lips and in [her] eyes all at once." Ms. Tenort estimated that the Defendant punched her "five or six times."

Ms. Tenort tried to push the Defendant away, but she could not. The Defendant then "start[ed] grabbing [her] by [her] neck" and choking her. The Defendant tried to push Ms. Tenort "down to the ground." At that point, Ms. Tenort's oldest son attempted to defend her by hitting the Defendant, but the Defendant "[s]wung back" at the boy. While the Defendant was striking the boy, Ms. Tenort was able to get up, and she demanded that the Defendant "look at what [he had done] to [her] face." The Defendant started to turn away, and Ms. Tenort "swung back real hard and . . . hit him in his eye and he buckled to the ground" grabbing his face.

The Defendant got up and said, "[B]---h, if I can't find my weed, I'm going to kill you." The Defendant started towards the bedroom, and Ms. Tenort told him that she thought the marijuana was in the nightstand. At this point, Ms. Tenort noticed her youngest son in the kitchen opening the refrigerator. Ms. Tenort helped the child "get a juice" and closed the refrigerator. Ms. Tenort then saw the Defendant coming out of the bedroom. Ms. Tenort made her way back to the dining room and told the Defendant that she had "told [him] [he] was going to find [his] weed."

The Defendant grabbed Ms. Tenort and pulled out a revolver from "[u]p under his shirt in his pants." Ms. Tenort thought the Defendant was going to shoot and kill her. Instead, the Defendant hit her with the gun on the left side of her head. Ms. Tenort testified that the Defendant then ran away, taking the gun with him, and that she chased after him yelling for "somebody [to] kill him for [her]." Ms. Tenort further testified that she knew the gun belonged to the Defendant, that he had it "for some months," and that he usually kept it on her "entertainment set."

After the Defendant ran away, Ms. Tenort got in the shower and put a towel around her head to stop the bleeding. Ms. Tenort testified that her head felt "like a bowling ball" and that she was worried that she was going to have a seizure. Ms. Tenort further testified that the pain in her face and head continued after she had been treated at the hospital and that she now gets headaches.

On cross-examination, Ms. Tenort admitted that she had a prior conviction for forgery. Ms. Tenort also admitted that the Defendant saw her and the children in violation of the order of protection. Ms. Tenort claimed that she only tolerated this to allow the Defendant to see his son. Ms. Tenort denied being afraid of the Defendant. Ms. Tenort also denied using marijuana the morning of the March 2014 attack. Ms. Tenort also denied telling hospital staff that she was upset with herself for trying to get back together with the Defendant.

Ms. Tenort denied that she and the Defendant were in a relationship on March 21, 2014. Ms. Tenort explained that while she had proposed to the Defendant at the end of February 2014, she and the Defendant had "got to arguing a couple days before" the attack and the Defendant "left." Ms. Tenort admitted that the Defendant had lived in her apartment from the time that they got engaged until "a couple days before" the attack.

MPD Officers John Cantor and Shondra Wicks responded to Ms. Tenort's apartment on March 21, 2014. The officers found the walkway leading to Ms. Tenort's apartment "covered with blood." There was also "[a] lot of blood . . . inside the apartment building," on the apartment door, and on the floor inside the apartment. Ms. Tenort was "bleeding from the head" and had a rag over her head "trying to apply pressure." Officer Wicks noticed "a whole bunch of blood" coming from Ms. Tenort's wound. Officer Cantor described Ms. Tenort as being "[h]ysterical," and Officer Wicks described her as "a little deranged, excited." The Defendant was not at the apartment, and the officers did not see any weapons in the apartment. An ambulance was called to take Ms. Tenort to the hospital.

Ms. Tenort was treated at the emergency room of Methodist South Hospital. Ms. Tenort had "a laceration to the scalp on the left side [of her head that was] about four centimeters long." There was swelling around the area of the laceration. Ms. Tenort also had "swelling on the left jaw" along with "swelling and bruising of her nose." A computerized tomography scan revealed that Ms. Tenort "had a fracture of the nasal bridge." Ten staples were used to close the laceration on Ms. Tenort's head. Ms. Tenort stated that she was "dazed," but she did not lose consciousness while she was being treated. Ms. Tenort was given prescriptions for pain killers and antibiotics when she was discharged from the emergency room.

The nurse who cared for Ms. Tenort, Deborah Williams, testified that Ms. Tenort was "upset, worried about her children[,]" and afraid to return to her apartment. None of the medical personnel who treated Ms. Tenort thought she seemed intoxicated while she was at the emergency room. Lashawn Lewis, a "medical social worker" at Methodist South Hospital, recalled that Ms. Tenort was "very distraught and upset" when they spoke and that Ms. Tenort was worried about going back to her apartment. Ms. Lewis also testified that Ms. Tenort was "very remorseful . . . and upset with herself" for getting back together with the Defendant. Ms. Lewis recalled that Ms. Tenort told her that she shared an apartment with the Defendant and that the fight began with an argument over alcohol and marijuana.

Based upon the foregoing, the jury convicted the Defendant of aggravated assault involving the use or display of a deadly weapon, aggravated assault based on violation of a court order, and domestic assault. The jury acquitted the Defendant of the unlawful possession of a firearm charge. The trial court merged the domestic assault conviction

into the aggravated assault based on a violation of a court order conviction. The Defendant was sentenced as a career offender. The trial court imposed sentences of fifteen years for each aggravated assault conviction and ordered the sentences to be served consecutively, for a total effective sentence of thirty years. The Defendant now appeals to this court.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction for aggravated assault involving the use or display of a deadly weapon. The Defendant argues that the State failed to present "proof that [he] possessed or used a deadly weapon." To support this argument, the Defendant asserts that the jury discredited Ms. Tenort's testimony about the revolver by acquitting him of the unlawful possession of a firearm charge. The State responds that the evidence was sufficient to sustain his conviction.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence."

State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Here, the Defendant only challenges the proof regarding his use or display of a deadly weapon during the aggravated assault, noting that the jury acquitted him of the unlawful possession of a firearm charge. However, "an inconsistency in multiple count verdicts in a criminal prosecution is [generally] not a basis for relief." State v. Thompson, 285 S.W.3d 840, 849 (Tenn. 2009). To that end, this court "will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned." State v. Davis, 466 S.W.3d 49, 76 (Tenn. 2015) (quoting Wiggins v. State, 498 S.W.2d 92, 94 (Tenn. 1973)).

Ms. Tenort's testimony alone was sufficient to establish that the Defendant hit her in the head with a revolver. See State v. Tamaine Works, No. W2005-01048-CCA-R3-CD, 2006 WL 1491636, at *12 (Tenn. Crim. App. May 26, 2006) (noting that this court "has previously held that convictions based upon witness testimony alone are sufficient") (citing State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)). Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for aggravated assault involving the use or display of a deadly weapon.

## II. Election of Offenses

The Defendant contends that the trial court's failure to require the State to make an election of the distinct conduct it was relying upon regarding the charge of aggravated assault based on violation of a court order was plain error. The Defendant argues that there were "at least four separate and distinct acts . . . that could form the basis for [this] conviction." Specifically, the Defendant notes that he approached Ms. Tenort in a "hostile way," he repeatedly punched Ms. Tenort's face, he threatened to kill her if he could not find his marijuana, and he struck her in the head with a handgun. The Defendant argues that this error denied "his constitutional right to a unanimous verdict." The State responds that the prosecutor's "closing argument rendered any failure to elect offenses harmless beyond a reasonable doubt."

The Defendant failed to raise this issue at trial or in his motion for new trial; therefore, we examine the issue solely under plain error review. State v. Smith, 492 S.W.3d 224, 232 (Tenn. 2016) (stating that failure to raise an election of offenses issue in the trial court waives direct appellate review but does not preclude plain error review).

The doctrine of plain error applies when all five of the following factors have been established:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused must not have waived the issue for tactical reasons; and
> (e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Our supreme court recently held in a case involving a conviction for aggravated assault based on violation of a court order that the State had "adduced proof of more than one incident that each matched the allegations of the charging instrument," thus implicating "the election of offenses doctrine," and that the State's failure "to elect the specific instance for which it wanted the jury to consider for the aggravated assault charge" was plain error. Smith, 492 S.W.3d at 236, 239. However, the two incidents at issue in Smith occurred at two separate residences and after a period of time had elapsed between the first and the second incident. Id. at 228.

In contrast, the events at issue here all occurred within a matter of minutes and all within the same room of Ms. Tenort's apartment. "[T]he gravamen of the aggravated assault statute is injury, fear, or physical contact," and there is "nothing in the statute to indicate that the legislature intended for defendants to be punished separately for each blow or injury." State v. Pelayo, 881 S.W.2d 7, 11, 13 (Tenn. Crim. App. 1994). Therefore, separate acts which are minimally "separated by time and place" can "coalesce[] into an 'unmistakable single act'" that constitutes one aggravated assault. Id. at 13. Therefore, in determining whether separate acts provide sufficient grounds for multiple aggravated assault convictions we perform "a conscientious consideration of the temporal and geographic proximity of the separate acts." Id.

The Defendant repeatedly punched and choked Ms. Tenort until she punched him in the face. The Defendant then threatened to kill Ms. Tenort if he could not find his marijuana and exited the room. The Defendant returned moments later and struck Ms. Tenort on the head with a revolver. We conclude that the Defendant's actions occurred in such close temporal and geographic proximity that they constitute one act of aggravated assault. See Pelayo, 881 S.W.2d at 12-13 (finding one aggravated assault where the defendant cut the victim with a knife inside her apartment, chased her outside as she attempted to flee, and cut her a second time outside the apartment); cf. State v. Glenn Lydell McCray, No. M2011-02411-CCA-R3-CD, 2013 WL 1870872, at *14

(Tenn. Crim. App. May 2, 2013) (finding two separate aggravated assaults had occurred where the defendant had first assaulted the victim with the butt of a rifle and a metal bat, then went to a different room and "began to doze" before cutting the victim's throat when she later attempted to leave the apartment). As there was only one aggravated assault, the State was not required to make an election of offenses. Accordingly, we conclude that there was no plain error because there was no breach of a clear and unequivocal rule of law.

### III. Merger of Convictions

While not raised by either of the parties, we note that the trial court erred by failing to merge the Defendant's aggravated assault convictions.[2] While "the elements of the two types of aggravated assault are distinct, there [was] still only one assault and one victim." State v. Dannaer Beard, No. W2013-00502-CCA-MR3-CD, 2014 WL 5465860, at *5 (Tenn. Crim. App. Oct. 28, 2014). Put another way, aggravated assault involving the use or display of a deadly weapon and aggravated assault based on violation of a court order "are two ways to commit the same offense of aggravated assault." Id. Failure to merge the aggravated assault convictions constituted plain error. State v. Paul Brent Baxter, No. M2016-00049-CCA-R3-CD, 2016 WL 5831616, at *3 (Tenn. Crim. App. Sept. 30, 2016). Accordingly, we merge the Defendant's conviction for aggravated assault based on violation of a court order into his conviction for aggravated assault involving the use or display of a deadly weapon. We remand the case to the trial court for entry of corrected judgment forms reflecting this merger and the resulting sentence of fifteen years' incarceration.

After the initial filing of this opinion, the State filed a petition to rehear pursuant to Tennessee Rule of Appellate Procedure 39 requesting that supplemental briefing be allowed on this issue. We granted the State's petition. In its supplemental brief, the State contends that our decision to merge the aggravated assault convictions was erroneous. Citing to Smith, the State argues that the "same elements test" from Blockburger should have been applied and that we should treat the various subsections of the aggravated assault statute as "separate statutes for double-jeopardy purposes." We decline to do so.

As stated in footnote two of this opinion, our supreme court in Smith applied the Blockburger "same elements test" in addressing multiple subsections of the false reporting statute. 436 S.W.3d at 766-68. However, the supreme court held that the

---

[2] In declining to merge the aggravated assault convictions, the trial court cited to State v. Smith, 436 S.W.3d 751, 766-68 (Tenn. 2014), which applied the "same elements test" from Blockburger v. United States, 264 U.S. 299 (1932), in addressing multiple subsections of the false reporting statute. However, in an attempt "[t]o be precise and foster clarity in Tennessee law" our supreme court in State v. Watkins, 362 S.W.3d 530, 545 n.26 (Tenn. 2012), stated that the "same elements test" was "of no value" when addressing "claims that involve multiple convictions under the same statute."

multiple charges involved in <u>Smith</u> did not arise out of the same act or transaction because the defendant "engaged in proscribed conduct on different dates involving a police dispatcher and three different law enforcement officers." <u>Id.</u> at 767. The question of whether the charges arise from the same act or transaction is a "threshold inquiry under <u>Blockburger</u>." <u>Watkins</u>, 362 S.W.3d at 545. "When a court determines that separate convictions do not arise from the same act or transaction, then there cannot be a double jeopardy violation; thus courts need not proceed to the second step of the <u>Blockburger</u> test." <u>Id.</u> Because the supreme court held in <u>Smith</u> that the charges did not arise out of the same act or transaction, its application of the second step of the <u>Blockburger</u> test to the subsections of the false reporting statute was dicta. We do not find <u>Smith</u> to be controlling on this issue in light of the supreme court's earlier, explicit statement that the "same elements test" is "of no value" when addressing "claims that involve multiple convictions under the <u>same</u> statute." <u>Id.</u> at 545 n.26. As such, we reaffirm our original holding in this matter and merge the Defendant's aggravated assault convictions.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, we affirm the trial court's judgments as to the Defendant's convictions. However, the trial court's failure to merge the aggravated assault convictions constituted plain error. The case is remanded to the trial court for entry of corrected judgment forms reflecting the merger of the convictions and resulting sentence of fifteen years' incarceration.

_____
D. KELLY THOMAS, JR., JUDGE